HENRY ESCARSEGA #0903362
999 W. MATTHEWS Rd. I-2-#6
FRENCH CAMP, CA 95231.

FILED
DEC 15 2009
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY [signature]
DEPUTY CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HENRY ESCARSEGA,<br>Plaintiff,<br>v.<br>City of Stockton; STOCKTON police Dept; OFFICER FRitts; OFFICER Mc CutCHEON; OFFICER HUFF, ET. AL, individually and in their OFFICIAL capacities,<br>Defendants, | No. 2:09cv 3466 JFM (PC)<br>ComPLAINT<br>Violations pursuant to the IV., VIII., and the XIV. amendment to the U.S. Constitution |

I. JURISDICTION & VENUE

1. This is a civil action authorized by 42 U.S.C. Section 1983 to redress the deprevation, under color of State law, of rights secured by the constitution of the united States. The court has Jurisdiction under 28 U.S.C. Section 1331 and 1343(a)(3). Plaintiff seeks declaratory relief pursuant to 28 U.S.C. Section 2201 and 2202.

2. The District court Easter District of California

1391(b)(2) because it is where the events giving rise to this claim occured.

II. Plaintiffs

3. Plaintiff, HENRY ESCARSEGA, is and was at all times mentioned herein a prisoner confined in SAN JOAQUIN COUNTY JAIL, in The city of French camp, CALifornia.

III DEFENdants

4. DEFENDANTS, City OF Stockton is the Supervisor of the Stockton police Dept. He is legally Responsible for the overall operation of the Stockton police Dept, including it's officers.

5. DEFENDANT, Stockton police Dept. is legally responsible to ENforce the law's, Rules & policies of the city of stockton, California and for the welfare of all the citizens of that city.

6. DEFENdant's, Mc cutcheon, Fritts, and HUFF are officers of the Stockton police Dept. who, At all times Mentioned in this complaint, held the position of under cover agents and where Assigned to the civil District of Stockton, CALIFORNIA.

7. Each defendant is sued individually

and in his official capacity. At all times Mentioned in this complaint each Defendant acted under color of State law.

III. FACTS

8. ON OR ABOUT FEBRUARY 4, 2009, while Employed by THE City of STOCKTON, ACTING UNDER THE Authority of the STOCKTON POLICE DEPT., Officer's McCutcheon, and Huff CONDUCTED AN ILLEGAL SEARCH AND SEIZURE based upon Information and belief of drug activity, supplied by Officer Jimmy Fritts.

9. OFFICER'S McCUTCHEON, AND HUFF WERE directed to the Residence of 835 w. Fremont street. SEE EXHIBIT (A). THE OFFICERS watched the Residence for approximately ONE [1] Hour for Signs of drug activity, To which NONE WAS Noted. SEE EXHIBIT (A).

10. UPON SEEING [NO] drug activity officers McCutcheon, And Huff, Knocked on the Door of 835 w. fremont, and RECIEVED [NO] ANSWERS. THEY then went NEXT door to the Adjoining Residence, 837 w. fremont street, And asked one of the occupants, Lavender Hughes, if "Jessie Sarraraz" Lived there. Lavender Hughes stated, [NO]. She was in Her front drive way. SEE EXHIBIT (B).

11. UPON BELIEF of smelling MariJuana, officer's McCutcheon, And Huff Proceeded to the front door of "837 w. fremont street," And Entered without consent, or Sufficient cause to Justify a warrantless search And seizure. SEE Exhibit (C)

12. Prior To Entry, officer Huff said He seen

Plaintiff, Henry Escarsega, [Herein After, Escarsega] swallow what he "Assumed" was a Bindle of Narcotics, which Later Proved unJustified. SEE Exhibit (C).

13. At the time officer's Mc Cutcheon, and Huff Entered the Home at 837 w. Fremont street, they Knew before Hand that Plaintiff Escarsega "was not" the Person [Jessie Sarraraz], whom was under Surveillance, Nor, whether or not Plaintiff Escarsega was on Parole. SEE Exhibit (D). [officer's Searched the Residence at 837 w. Fremont street, "After", finding out Plaintiff's was on Parole].

14. UPon Information and Belief, Plaintiff Escarsega Alleges there was no drug Activity Noted at Either, 835 w. Fremont street, Nor 837 w. Fremont street. SEE Exhibit (D)

15. UPon Information And Belief, Plaintiff Escarsega, Alleges THERE was Not Sufficient CAUSE To Justify Entry into his Home, or Seizure of His Property, because the Smell of MariJuana, or the Assumption that Plaintiff Swallowed Narcotics [did not] give rise to the Level of Exigent circumstances, Justifying A warrantless Search. SEE, Points of Authorities, Attached Hereto and fully inCorporated Herein, As Exhibit (E).

16. UPon Information And Belief, Plaintiff Escarsega, Alleges THE xraying of His stomach Contents; the forced intake of a Liquid Laxative; and, insertion of Suppositories into his Anal Cavitiy, Proved Negative results for drug intake and violated his rights. SEE, "Points and Authorities", Exhibit (F).

## IV. LEGAL Claims

17. Plaintiff realleges and incorporates by reference, 1-16

18. The warrantless search into his Home, and seizure of his property without "Exigent circumstances," violated Plaintiff Escarsega's rights and constituted a violation of his Constitutionals Rights and due Process under the IV and XIV Amendment's of the United States Constitution.

19. The diliberate indifference and medical Intrusion into his Body with "Negative Results," was a violation of Cruel and Unusual Punishment, a due Process violation under the Eighth and Fourteenth Amendments to the United States Constitution.

20. Plaintiff Has no Plain, adequate or Complete remedy at law to redress the wrongs described herein. Plaintiff Has been and will continue to be irreparably injured by the Conduct of the Defendant's unless this Court Grants the declaratory and Punitive releif Plaintiff seeks.

## V. Prayer For Relief

wherefore, Plaintiff respectfully Prays the Court enter Judgement Granting Plaintiff:

21. A declaration that the acts and omissions described herein violated Plaintiff's right under the Constitution and laws of the United States.

22. A Preliminary and Permanent Injunction ordering Defendant's [Stockton Police Dept.] and

All officer's, specifically officer's McCutcheon, Huff and Fritts, to refrain from any forms of Reprisals, Harrassment and/or Punishment as a result from this Action.

23. Compensatory damages in the Amount of $25,000 against each defendant, Jointly and Severally.

24. Punitive damages in the Amount of $10,000 against each defendant.

25. A Jury Trial on all issues triable by a Jury

26. Plaintiff's Cost in this Suit

27. Any additional relief this court deems just, proper and Equitable.

Dated: 11/20/09

Respectfully Summitted,

signed: *Henry Escarsega*

Verification

I, HENRY ESCARSEGA, am the Plaintiff in the ABOVE Entitled action, Declare under Penalty of Perjury that the foregoing is true and Correct, as to matters based upon Information and Belief, I deem them True and Correct as stated.

Dated: 11/20/09

Respectfully Submitted,

Signed: *Henry Escarsega*

EXHibit
(A)

HENRY R. ESCARSEGA JR. #0903362
999 W. MATTHEWS Rd I-2-#6
FRENCH CAMP, CA. 95231

People V. Escarsega — **AFFIDAVIT** — CASE NO. SF-110946 A

(EXHIBITS)

I, HENRY R. ESCARSEGA, AM THE AFFIANT IN THIS CRIMINAL CAUSE OF ACTION, IN THE SAN JOAQUIN COUNTY SUPERIOR COURT, CASE NO. SF-110946A, WHEREAS ON OR ABOUT MARCH, 9 2009, WHILE BEING HELD TO ANSWER A PRELIMINARY HEARING WAS CONDUCTED, WHICH WAS bound OVER TO TRIAL COURT.

ON FEB, 4, 2009, My DUE PROCESS & CONSTITUTIONAL RIGHTS UNDER THE 4TH AMENDMENTS WERE VIOLATED by STOCKTON Police DEPT. ET. AL., by THE ADVISE OF DET. FRITTS, including OFFICER'S FRANK McCUTCHEN & OFFICER HUFF, ETC, FOR CAUSEING AN "ILLEGAL SEARCH & SEIZURE" AS WELL AS ARREST WITHOUT A WARRANT, NOR CONSENT OR PERMISSION FOR ENTERING MY HOME, IN ERROR. SEE (MYERS V. SUPERIOR COURT, (2004) 124 CAL. App. 4TH 1251).

PLEASE TAKE JUDICIAL NOTICE, THAT ON THE DATE OF ARREST OF FEB 4, 2009 I did NOT POSSESS, NOR WAS I UNDER THE INFLUENCE OF ANY DRUG, YET I WAS CHOKED by STOCKTON P.D. OFFICERS, by USE OF EXCESSIVE FORCE. AS WHICH THEY FABRICATED A STORY TO POSSIBLE JUSTIFY WHY THEY ENTERED MY HOME WITHOUT CONSENT, STATING THAT I SWALLOWED A "BINDLE OF SUSPECTED NARCOTICS". SEE (ATTACHED EXH, pg 4, PARAGRAPH 4) WHERE A Simple MOTRIN 800 pill WHICH I WAS TAKING AT THE TIME THE OFFICER'S ENTERED MY HOME, CAUSED A ROLLERBALL EFFECT OF MISCONDUCT & CIVIL RIGHTS AS WELL AS CONSTITUTIONAL VIOLATIONS. SOON THERE AFTER, $1,775.00 DOLLARS OF MINE WERE TAKEN, I WAS FALSELY ARRESTED, DETAINED FOR HOURS IN A HOSPITAL WHICH CAUSED CRUEL & UNUSUAL PUNISHMENT AND TAKEN TO JAIL.

THE OFFICER'S NEVER READ ME MY MIRANDA RIGHTS UNTIL WAY AFTER THE SEARCH & SEIZURE, YET WHILE IN THE HOSPITAL SEE (PARAGRAPH 7 OF pg 6) I INFORMED THE OFFICER THAT I HAD TAKEN A PILL. ALSO, SEE (pg 4, LAST PARA) WHERE IT WAS CONFIRMED THAT I LIVED AT "837, NOT 835" W. FREMONT ST., WHICH THE ENTIRE ARREST WAS ERRONEOUS. *

WHILE OFFICER McCUTCHEN WAS SEARCHING MY GIRLFRIENDS PROPERTY, SHE INFORMED BOTH OFFICER'S THAT "ALL THE CRYSTAL IS MINE; HE HAD NOTHING TO do WITH IT". SEE (pg 5, PARA 10).

PURSUANT TO PENAL Code § 1385 "IN THE INTREST OF JUSTICE" AND TO PROTECT ALL OTHER DUE PROCESS & CONSTITUTIONAL RIGHTS, I CONTEND THAT ALL CRIMINAL CHARGES BE DISMISSED AND THAT I BE RELEASED TO PAROLE REVOCATIONS.

I, HENRY R. ESCARSEGA JR, AM THE AFFIANT, AND DECLARE THAT THE FOREGOING IS TRUE & CORRECT AND THAT THIS AFFIDAVIT / DECLARATION WAS EXECUTED ON

CC: SAN JOAQUIN CO. SUPERIOR COURT
DISTRICT ATTORNEY OFFICE & ALL COUNSEL

Henry Escarsega
SIGNATURE OF AFFIANT / DECLARANT

# Incident Report

## STOCKTON POLICE DEPARTMENT

09-5986

Supplement No ORIG

**ARRESTED 3: Confidential**

| Involvement | Invl No | Name |
|---|---|---|
| ARR | 3 | See Confidential Page |

**ARRESTED 4: Confidential**

| Involvement | Invl No | Name |
|---|---|---|
| ARR | 4 | See Confidential Page |

**SUBJECT INVOLVED 1: HIDALGO,GERALDINE**

| Involvement | Invl No | Type | Name | MNI |
|---|---|---|---|---|
| SUBJECT INVOLVED | 1 | Individual | HIDALGO,GERALDINE | 66867 |

| Race | Sex | DOB | Age | Juvenile? | Height | Weight | Hair Color | Eye Color |
|---|---|---|---|---|---|---|---|---|
| | | | | No | | | | |

| Type | Address | City | State |
|---|---|---|---|
| HOME | | | CALIFORNIA |

**VICTIM 1: Confidential**

| Involvement | Invl No | Name |
|---|---|---|
| VIC | 1 | See Confidential Page |

**VICTIM 2: Confidential**

| Involvement | Invl No | Name |
|---|---|---|
| VIC | 2 | See Confidential Page |

**Modus Operandi**

| Premise Type | Crime Code(s) |
|---|---|
| RESIDENCE | NARCOTIC PROBLEM |

**Narrative**

**NOTIFICATION** :

On 02/04/2009 at approximately 1939 hours Officer Huff and I (Officer F. McCutcheon CPO48) conducted a check out at 837 W. Fremont.

**INVESTIGATION** :

We were wearing plain clothing with police cover vests on. The vests have "POLICE" embroidered in large letters on the front and back of the vests. [illegible] We went to the location in our unmarked police vehicle. We watched the location. I saw children (VIC1) (VIC2) coming and going from a door on the west side of the residence. We saw (ARR)Lavender Hughes, (ARR)Henry Escarsega, and Geraldine Hidalgo coming and going from the west door of the residence.

~~The residence appeared to be a single family older house with a single driveway and garage.~~

~~We approached the residence. I saw (VIC1) and (VIC2) playing in the drive way. I saw Hughes and Hidalgo standing in the drive way.~~

We walked up to the open west door. I could smell the strong odor of marijuana emitting from the open front door. I saw Escarsega standing just a few feet inside the open front door holding a white plastic bindle in his right hand and he appeared to be looking at it. ~~From my training and experience I recognized the size and shape of the bindle as a suspected narcotics packaged.~~ Escarsega looked up towards us and appeared to become very nervous. Officer Huff ordered Escarsega to ~~drop the suspected narcotics bindle.~~
Escarsega raised his right hand towards his mouth. [illegible] Officer Huff took ahold of Escarsega's right arm as Escarsega placed the suspected narcotics bindle in his mouth.

Hughes approached me from behind and began pushing me from behind as if she was trying to push me away from Escarsega.

Officer Huff placed handcuffs on Escarsega. I placed handcuffs on Hughes. Officer Huff asked Escarsega if he is on parole. Escarsega said he is on parole. I searched Escarsega and removed his wallet from his right rear pants pocket. ~~I saw his wallet contained $1500.00 (15 hundreds). I located $275.00 (one 5, three 10's, 7 twenties and 1 hundred) in Escarsega's right front pants pocket. I located a cell phone in Escarsega's left front pants pocket.~~

I told Escarsega we received a report of narcotics sales activity at 835 W. Fremont. Escarsega said his address is 837 W. Fremont and he lives there with his girlfriend Hughes and her two children (VIC1) and (VIC2). The address

EXHibit

(B)

possession, possession for sales type cases, and predominantly rock cocaine and heroine.

Q. And have you previously qualified in court as an expert in the recognition for sale of controlled substances?

A. Yes.

Q. Were you so employed and on duty on February 4th of this year at approximately 7:40 p.m?

A. Yes.

Q. Did you and your -- were you with a partner that day?

A. Yes.

Q. And were you and your partner in a marked or unmarked vehicle?

A. Unmarked vehicle.

Q. Did you go to the area of 835 West Fremont Street in the City of Stockton, San Joaquin County at that time?

A. Yes, we did.

Q. And why did you decide to go there at that particular time?

A. I received information that there was suspected narcotics being sold at 835 West Fremont.

MR. CARNEY: Objection, Your Honor. Hearsay.

THE COURT: Introduced for the truth, Ms. Aguirre? Is that being introduced for the truth?

MS. AGUIRRE: Well, we have a motion to suppress, so it goes to explain why the officers went to

that particular location.

THE COURT: I'll allow it for that purpose.

MR. CARNEY: Your Honor, for the record, it is double hearsay.

THE COURT: He didn't say what he heard. What was the hearsay? He received information. You can ask him whether he received information.

MR. CARNEY: But he said specifically what that information was.

THE COURT: It's only being introduced to show why he went there.

MR. CARNEY: Right. And that would go to the underlying charges on the case.

THE COURT: Well, it's only being introduced at this point as to why he went there, okay. So --

MR. CARNEY: We'd still object for the record.

THE COURT: What's the objection?

MS. AGUIRRE: For purposes of the preliminary hearing, Your Honor, hearsay is allowed per --

MR. CARNEY: Double hearsay is not. Double hearsay is not. That's the basis for our objection.

THE COURT: He didn't indicate who he got the information from, so I don't know that it qualifies under --

MR. CARNEY: Then the objection would be as to foundation.

THE COURT: I sustained that insofar as it

comes in for the truth.

MR. CARNEY: Okay.

THE COURT: She's only offering it for why he went there at this point. You may continue.

MS. AGUIRRE: Q. And did you subsequently go to that location?

A. Yes.

Q. And did you conduct surveillance?

MR. CARNEY: Objection, Your Honor. Leading.

THE COURT: I'll sustain that.

MR. CARNEY: Just a form objection.

MS. AGUIRRE: Q. You went there?

A. Yes.

Q. What did you do when you got there?

A. We watched it for approximately an hour.

Q. What did you observe?

A. Mr. Escarsega, wearing orange sitting next to Defense Counsel, Ms. Lavender Hughes, wearing the tan jacket sitting next to Defense Counsel, another adult female and two children coming and going from the west door of the residence.

And then after watching it for about an hour, we decided to approach the front -- front door -- approached what we believed was the side door where they were coming and going from.

MR. CARNEY: Objection, Your Honor. Just another form issue. I think it would be more appropriate

driveway.

MS. AGUIRRE: And for the record, Your Honor, Officer McCutcheon has previously identified both Defendants who are sitting here in court.

THE COURT: He has? Well --

MS. AGUIRRE: He did.

THE COURT: He did. Who is Mr. Escarsega?

THE WITNESS: Defendant wearing orange.

THE COURT: He's the only one wearing orange, so he's identified the Defendant Escarsega. And did you identify Ms. Hughes?

THE WITNESS: Yes. She's wearing the tan jacket sitting next to Defense Counsel.

THE COURT: Record will indicate he has identified Ms. Hughes.

MS. AGUIRRE: Thank you.

Q. So you observed what was going on there in that -- around that house for about an hour, you say?

A. Approximately an hour.

Q. And you decided to approach the house at some point?

A. Yes.

Q. And what did you do when you decided to approach?

A. We knew there was still one person inside the house that we had seen re-enter the house. That was Mr. Escarsega. And Ms. -- Ms. Hughes was in the driveway, and an older lady and the two children were in the driveway. So we walked up to the west door of the house where we had last seen Mr. Escarsega walk in.

EXHibit
(C)

Q. And the other individuals were still on the outside part of the house?

A. Yes.

Q. You mentioned that there were two children. Did you subsequently obtain their names and date of birth?

A. Yes.

Q. And could you give us their names and date of birth?

A. Can I refer to my report?

Q. Did you write a report in this case?

A. Yes.

Q. And would that refresh your recollection?

A. Yes. They were two males, ages of three and four, but I'll get you their names. Nicholas Harrington and Roy Hughes.

Q. And did you also get their date of birth?

A. Oh, I'm sorry. Yes. The date of birth for Roy Hughes is 4-27-2005, and the date of birth for Nicholas Harrington -- I'm sorry, I got the ages wrong. The date of birth for Nicholas Harrington is 2-27-2000, and he's eight. And the -- and Hughes is two -- wait. I'm reading party numbers. Hughes is three and Harrington is eight.

Q. Now, as you approached the west side of the house, what did you personally observe?

A. As soon as we got up to the front porch or the west of the porch on the west side, there's a strong odor of marijuana. We got to the front door of the house or the west door, it was wide open, no screen door or nothing. The screen door was completely wide open.

Mr. Escarsega was standing just inside the open front door, and he had his hand out in front of him, palm up. He had a white plastic bindle-type object that from my training and experience, I believe it was suspected narcotics.

Q. And what did you subsequently do when you made these observations?

A. He -- Mr. Escarsega appeared to become nervous. We were wearing police cover vests. He was looking directly at us, appeared to become nervous, and began to step backwards and raised his hand towards his mouth. Officer Huff stepped inside that house towards Escarsega, grabbed his right arm, and I was right behind Officer Huff as we entered. But Escarsega managed to get his head down to his right hand and eat the suspected narcotics.

Q. Was anything said to him by either yourself or Officer Huff before you actually went in toward the house?

A. ~~I believe we told him we're Stockton Police~~ right when we ~~got at the front door, and I remember Officer Huff telling him not to eat the narcotics~~.

Q. So you subsequently went in, and what happened once you got inside?

A. Mr. Escarsega was trying to pull away from us as he was trying to -- ~~as he was trying to swallow what we believed~~ was narcotics. ~~Officer Huff managed to get cuffs on him~~. But it took a minute because Escarsega was trying to pull away from us. Ms. Hughes came up from behind me and was pushing and shoving me. I believe she was trying

that point, and they are asking him what his status is. I -- I think they could ask that.

THE COURT: If it's Miranda, I'm going to overrule it. Why don't you say again what you were asking.

THE WITNESS: Officer Huff asked him if he was on parole or probation, and Mr. Escarsega said "Parole."

MS. AGUIRRE: Q. And what did you do once you determined this information?

A. I searched Mr. Escarsega.

Q. And what, if anything, did you find on him?

A. I found a large amount of money. $1500, I believe, was in his wallet, which was in his rear pocket, and $275 was in his right front pants pocket, I believe.

Q. And what were the denominations of the money in his wallet?

A. I believe it was mostly hundreds -- you said wallet?

Q. Wallet. Yes.

A. Could I refer to my report?

Q. If that would help you refresh your recollection.

A. Okay. The wallet contained the $1500. It was in hundred dollars bills. And the wallet was in his right front pants pocket. $275 was five ones -- no, one five, three tens and seven twenties and one hundred.

Q. And that was the money that was in his other pants pocket?

A. In his right front pants pocket.

OFFICER MCCUTCHEON STATED IN HIS POLICE REPORT HE FOUND A CELL PHONE IN MY LEFT FRONT POCKET, BUT HERE UNDER OATH HE SAID HE DIDN'T FIND NOTHING ELSE BUT MONEY

Q. And did you find anything else on him at that point?

A. No.

Q. Did you have any other conversations with Defendant regarding your purpose for being there that day?

A. We told him that we were there because we heard that there was narcotics being sold at 835 West Fremont.

Q. And did the Defendant say anything to you regarding that?

A. He said that their address is 837 West Fremont. 835 is the front part of the house. And he said he lives at 837 with Ms. Hughes and her two small children.

MR. CARNEY: Your Honor, we just wanted to make a continuing objection as to the foundation of these initial statements, just for the record.

THE COURT: Okay. So after -- this was after -- I'm going to sustain that at this time. Do you want to present a foundation to see if these were questions or not? I think he's making a Miranda objection. Sounds like at this point he may be going beyond.

MS. AGUIRRE: Well, the officer just informed Defendant as to their purpose for being there, and the Defendant's just responding to that.

MR. CARNEY: I think --

THE COURT: I -- I'm not -- to me it was a little bit unclear. When you say did you have a conversation with somebody, it might be more than a statement. May be questions.

EXHibit
(1)

MS. AGUIRRE: Q. Officer McCutcheon, once you searched the Defendant, did you yourself make any particular statements to the Defendant?

A. I wanted to inform him why we were there. If I recall right, they were asking what we were doing there, and I wanted to inform them why we were there. And I told him we were there because we had a report of narcotic activities there at 835 West Fremont.

Q. And at that point, Mr. Escarsega made a statement to you?

A. Yes. Mr. Escarsega said their address is 837 West Fremont where he lives with Hughes and her two small children.

MR. CARNEY: Your Honor, we would reiterate our objection. It sounds like this was probably designed to illicit an incriminating response. So just for the record.

THE COURT: Okay. I'm going to overrule that. I didn't hear evidence of interrogation.

MS. AGUIRRE: Q. So, at this point, did you determine that there were two residences at that location, or did you determine anything about how these residences were connected?

A. They -- Mr. Escarsega basically said it was a divided house, he believed. And that's the way it appeared to us, was that it may have been a divided house -- not until a short time later that I had noticed out on the front porch -- which actually the side door to

KNEW THEY WERE AT 837#

the house had an 837 in black on a pillar post that goes to the roof.

Q. And so after you were told by Mr. Escarsega that he was on parole, did you do anything to verify that status?

A. Contacted our records and was advised that he's on parole for a 246, I believe.

Q. And so what did you do next?

A. Then I had subsequently searched what I believed was his bedroom. Right there in the living room where we were standing there's a door to the bedroom at the south end of the house, and the door was wide open. And there's --

THE COURT: Which door?

THE WITNESS: On the living -- if you walk in the front door, you're in the living room. And to the right of the living room is a bedroom. And there was an open door there.

THE COURT: Thank you.

MS. AGUIRRE: Q. And did you make any observations at that point?

A. I could see what I believed was suspected narcotics, package empty on the floor, just inside the door. I mean, just inside the bedroom door. I see male clothing in the closet -- across the bedroom, hanging in the closet. And I could see there was a dresser against the east wall that had a white narcotics-type bindle on the dresser. I entered the room and subsequently searched it.

Q. And what, if anything, did you locate in that

Speculation.

THE COURT: Let me see. Well, he's an expert in narcotics, so I'm going to allow the part where he said he looked -- sounds like he saw some video on there that looked like narcotic activity, but I don't know if there's sufficient foundation for gang activity at this point.

You could ask him specifically what he saw. I think the gang activity at this point is a conclusion.

MS. AGUIRRE: Q. What type of indicia did you find in that room? You said you found some indicia with Mr. Escarsega's name on it?

A. Yes.

Q. And --

A. There was -- there was a male -- may I prefer to my report?

Q. If that would refresh your recollection.

A. Okay. In that middle dresser drawer, there was mail addressed to Mr. Escarsega, and then a trash can. To the left of the dresser was mail addressed from an insurance company to Mr. Escarsega.

Q. And was the male -- the address on that, those pieces of documentation, were they for 835 West Fremont Street?

A. Yes.

Q. I'm sorry, I meant 837.

A. 835. Yes, 837.

THE COURT: That's why we don't like leading questions. Okay.

IMPEACH TESTIMONY - DOC'S CONFIRM 835 #

Q. Okay. Now, where in that area were you, and I guess it was Officer Huff that was with you?

A. Yes.

Q. Okay. Other officers showed up later?

A. Yes.

Q. Okay. But at this time, it's just you and Officer Huff?

A. Yes.

Q. So where -- and you guys are sitting in a car, right?

A. Yes.

Q. Where are you parked watching this place?

A. The first corner, southwest corner. I'm not sure of the name of the street. Just west of the residence on the south side of the street.

Q. Okay. We've already established that there's a business on the west side of the residence, and it's on the corner, right?

A. Yes.

Q. So, you're diagonally across the street from that business?

A. Yes.

Q. Okay. And you're there for roughly an hour or so. And during that time that you were there watching the place, the only -- other than maybe passing cars, the only human activity particularly to this residence is these two people, a third adult later -- well, these two people and a third adult and two kids that from time to time come and

go from the side of this residence?

A. Yes. The older adult pretty much stayed outside most of the time. She didn't go in.

Q. Okay. Children outside most of the time too?

A. Correct.

Q. Okay. When they go back inside, the older lady goes back inside generally?

A. Yeah. I mean, the young kids went -- I didn't count how many times they went in and out of the house, but they did go in and out. And the older lady did go in and out, but they stayed outside more.

Q. I'm sorry, what?

A. They stayed outside the house more.

Q. All right. So you didn't see any -- never mind. Strike that. And at some point you and Officer Huff decide that you're going to go over to this residence, right?

A. Yeah. Actually, we got out of the car during that hour, and last 10, 15 minutes, we'd walked over to that business that's just west of it --

Q. Yeah.

A. -- and stood at the end of the driveway and watched them in the driveway or a minute -- for less than ten minutes.

Q. The driveway to the residence or the driveway to the business?

A. The driveway to the business -- to the residence, I'm sorry.

cross-examination.

MR. HUDSON: Thank you.

CROSS-EXAMINATION (RESUMED) BY MR. HUDSON

Q. I think generally speaking we left off with generally the area of questioning of you and Officer Huff arriving at the scene.

THE COURT: I believe the officer was standing on the street in a driveway area.

MR. HUDSON: At the driveway.

Q. Now, at this particular point, while you're at the edge of the driveway, you are not, if I understood your earlier testimony correctly, smelling anything?

A. No.

Q. You haven't detected any odor at this particular point?

A. No. Not at the end of driveway.

Q. Okay. And as far as activity with respect to the residence, you haven't noticed anything other than the people who are apparently associated in some manner with the residence there, correct?

A. Correct.

Q. And if I understood also your earlier testimony, you don't even know the names of the people who are associated with this residence until after you and/or -- at some point after you have made entry into the residence?

A. Yeah. I believe the residence when I first got there was 835 West Fremont. And the guy's last name -- he

had a specific last name that lived there. But then not until I had talked to these individuals that I --

Q. I'm talking about the one you ultimately end up going into. You don't even know who's there, who the names are?

A. No.

Q. Okay. Just so that we have some idea --

MR. HUDSON: May I approach the witness, Judge?

THE COURT: Yes.

MR. HUDSON: Thank you. We'll see about marking these if we need to later.

Q. I want to show you some photographs.

MS. AGUIRRE: And, Your Honor, for the record, I have not viewed those photographs.

THE COURT: I don't want you to show those photographs to the witness until the District Attorney has had a chance to see them as well as Co-Counsel.

MR. HUDSON: Okay.

MR. CARNEY: I've seen them, Your Honor.

THE COURT: Okay. Have they been marked?

MR. CARNEY: I don't think so.

MR. HUDSON: Not yet.

(Off the record.)

MR. HUDSON: And you've seen them, right?

MR. CARNEY: Yeah.

MR. HUDSON: To set the scene and --

Q. You could see the --

THE COURT: Well, let's --

MR. HUDSON: Let me try it this way for a second.

THE COURT: Okay.

MR. HUDSON: Q. You could see when you guys got there the items that are depicted in the pictures that I showed you, right?

A. Um --

Q. With the exception being the car wasn't there?

A. I don't remember seeing the mailbox that's on the post.

Q. The little black box?

A. Yeah. I don't remember seeing that.

Q. But otherwise they pretty much represent the scene?

A. Yeah. And I didn't notice the numbers until afterwards, when we walked back out.

Q. Okay.

THE COURT: Okay. I'll admit them. The objection goes more to the weight than the admissibility, so I'm going to admit those.

(Whereupon Defendant's Exhibits A through D, F and G were received in evidence.)

MR. HUDSON: Q. Okay. When you guys arrived, you had raid vests, or whatever you call them.

A. No.

Q. Do you know if that was done?

A. No.

Q. Okay.

A. I don't believe it was done. I didn't -- I didn't check her that I recall.

Q. That's all I'm interested in, is what you personally saw at the moment. Okay.

MR. HUDSON: I don't have any other questions at this point.

THE COURT: Mr. Carney.

CROSS-EXAMINATION BY MR. CARNEY

Q. Good afternoon, Officer McCutcheon.

A. Good afternoon.

Q. I'm going to try to make it as quick as possible, because we're kind of under time pressure.

A. Okay.

THE COURT: Well, don't feel that there's any time pressure. Just take -- do what you need to do.

MR. CARNEY: Okay.

Q. So you wrote the report in this case, right?

A. Yes.

Q. And then that report, of course, is true and accurate, right?

A. Yes.

Q. No lies or exaggerations?

A. No.

Q. And when you wrote the report, did you write it in a linear form, as the events occurred, or did you sort of mix it all up?

A. No. As events occurred from what I recalled.

Q. And you included all the relevant facts in the report?

A. Yes.

Q. Okay. And there's nothing you wish to add to the report at this point?

A. No.

Q. Okay. I had a few questions. You told the District Attorney that when you entered the house, Mr. Escarsega pulled away and kind of resisted you; is that correct?

Is that what you told him?

A. Yeah. That was after we saw him eat the suspected narcotics, or he started to raise it towards his mouth. And that's when we entered the house, and that's when he started pulling away from us.

Q. That's not in your crime report, is it?

A. Um --

Q. You can refer to your report if you want to check if it's in there.

A. No. I don't believe I put that in there.

Q. And you also mentioned to the District Attorney that you announced yourself as a Stockton police officer; is that correct?

A. I believe my partner did.

Q. Okay. And that's not mentioned in the report

(WHERE IS PG 57-59)

out in front of the house?

A. They were in the driveway inside the driveway area.

Q. Okay. And in the driveway. And they were with Ms. Hidalgo?

A. Most of the time. Then Ms. Hughes would watch out -- I mean, walk out every once in a while.

Q. So Ms. Hughes would come out and be with them every once in a while?

A. Yeah.

Q. Okay. Was anyone else that you didn't mention already there? I mean, excluding Mr. Escarsega and Ms. Hughes, Ms. Hidalgo and the two boys, was there anyone else out there?

A. No. I don't recall seeing anybody else.

Q. Okay. And you made these observations before you realized that the house was actually divided into two different units, right?

A. Correct.

Q. And that was before you saw the sign that identified the west entrance as 837?

A. Yes.

Q. Okay. And so of course you were trying to make sure that you get -- while you're surveilling the house, you're trying to make sure that everything is accurate, right?

A. Yes.

Q. And so you're trying to make sure that you've got the right address, right?

A. Actually, you know, we believed it was 835, and we

were watching the residence to see if we see any narcotics activity or anything suspicious happen.

Q. You said that you even approached the west side of the building. You got out of the car the last ten minutes that you were surveilling?

A. Yes.

Q. And you observed from that point?

A. Yes.

Q. Where were you? Were you on the outside or inside of the fence?

A. On the outside.

Q. And about how far from the west entrance do you think you were?

A. We were at the end of the driveway, their driveway.

Q. So just estimate it in yards.

A. Oh, from the west entrance of the house? What is it, probably 15 yards?

Q. Fifteen yards. And so at that point, did you see that it was 837 on the post?

A. No.

Q. Okay. And was there any reason for that? Was there an obstruction or anything blocking your view of the house?

A. It was dark and -- I mean, there was some light, I think. I don't know if they had a porch light out -- a porch light, or if it was some light emitting from the house or open door. I don't know. It was -- it may have been light from the interior of their house. But, no, it

right?

A. Yeah.

Q. Okay. And then when you were in there -- I mean, you noted in your crime report that you were searching that house pursuant to Mr. Escarsega's parole status; is that right?

A. Once we figured out -- once we determined he was on parole and lived there.

Q. And the search was pursuant to that?

A. Yes.

Q. So just going back to your initial observations, at what point did you decide to get out of the car?

A. Oh, I don't -- we didn't observe any short-stay traffic, so we thought we would go up and talk to the people at that point.

Q. Okay. And who was in front of the house when you walked up?

A. Ms. Hughes, her mother and the two children.

Q. Okay. All right. And you suspected drug activity at 835?

A. Yes.

Q. Did you ever enter 835?

A. (No response).

Q. Did you ever enter 835?

A. No. I believe I knocked on the front door, but nobody answered afterwards.

Q. Okay. And before you found Mr. Escarsega in the apartment, you didn't know where he lived, right?

A. Correct.

Q. And you didn't know his parole status either?

A. Correct.

Q. Okay. But you mentioned that you did know the name of the resident of 835?

A. Yeah. I [illegible] -- I as [illegible]. At last [illegible], I [illegible].

I had the whole name, but I just remember the last name.

Q. Okay.

Judge THE COURT: It was one of those

Defendants?

McCutcheon THE WITNESS: Yes.

MR. CARNEY: Q. And as you were walking up, you said you smelled what you thought was marijuana?

A. Yes.

Q. Okay. And could you describe the odor?

A. I guess like skunk weed type odor.

Q. Like a skunk?

A. Yeah.

Q. Okay. And so you thought someone was using marijuana inside?

A. As I got closer to the front door, I realized that it was coming from inside of the apartment.

Q. Okay. But you hadn't confirmed that at that point, right?

A. No. No, I didn't.

Q. So when you entered, you didn't see any marijuana when you first entered, right?

A. No.

Q. Okay. But you did eventually find marijuana in the living room after you searched the rest of the house?

A. Correct.

Q. And that marijuana was not out in the open, right?

A. No.

Q. Okay. And it wasn't in an obvious place, right?

A. It was in a black duffle bag there on the living room floor, black top of the black duffle bag was open.

Q. And you had to go through some things to get into the bag, or you mentioned that you found some things first in the report and then --

A. I'm trying to remember. It was in there -- there's a mixture of I think clothes in the bag, and it was more of that stuff.

Q. Okay. And it was a pretty small amount -- relatively small amount based on your training and experience, right, less than a gram?

A. I believe it was -- can I refer to my report --

Q. Yeah.

A. -- for a little bit more?

Q. I think it might have been a little more than half of a gram. I think it was .6 grams.

A. You're correct, .62 grams.

Q. So less than a gram?

A. Yes.

Q. So that's a relatively small amount of marijuana, right?

A. Yes. That's probably enough to roll several joints,

 MR. CARNEY: Okay. Well, I don't have any more questions about --

THE COURT: The question of marijuana is irrelevant. I'm going to sustain the objection. Especially since it appears to be such a small amount of marijuana. I don't see where that would be relevant to the methamphetamine or 273 charges.

MR. CARNEY: Okay.

Q. So just going back -- so you're on the front porch, and at that point you said you see -- you can see Mr. Escarsega?

A. Yes.

Q. Okay. And by that time, did you know that the unit was 837?

A. No.

Q. Okay. If you had to estimate, how many feet were there between the door and where Mr. Escarsega was standing when you first saw him?

MS. AGUIRRE: Again, Your Honor, these questions go, I believe, towards the 1538.

MR. CARNEY: Your Honor, may I clarify?

THE COURT: Yes.

MR. CARNEY: The testimony so far is that Mr. Escarsega had a bindle of what Mr. McCutcheon believes is methamphetamine. And that is, he is being accused of possessing that.

Judge ruled No Evid./Squash'd, "Just Cause"

THE COURT: No. No. I haven't heard any evidence to indicate that what he reportedly swallowed was

methamphetamine.

MR. CARNEY: What's that?

THE COURT: I haven't heard any evidence of what he purportedly swallowed was methamphetamine.

MR. CARNEY: I think he said suspected narcotic.

THE COURT: Right. No Grounds To SEArch/Susp. d drug ?

MR. CARNEY: Maybe I'm incorrect, but I believe the testimony was that he saw Mr. Escarsega swallow what he says was suspected narcotics. Maybe the witness can clarify.

THE COURT: How's that relevant to whether he possessed the narcotics in the bedroom?

MR. CARNEY: Well, it's relevant in the sense that we need to know how it is that he determined that he had narcotics.

MS. AGUIRRE: And, Your Honor, in that --

MR. CARNEY: The narcotics, how far away was it?

MS. AGUIRRE: We're not asking questions about what Officer McCutcheon saw in Mr. Escarsega's hands because that goes toward the 1538 as to Ms. Lavender. That's why I'm asking, is Counsel now bringing -- also bringing a 1538 motion?

MR. CARNEY: We are not, Your Honor. I'm asking specifically relative to the accusations that Mr. Escarsega possessed narcotics for sale.

THE COURT: Are you saying a consumer of

Stockton Police Department, for whatever reasons, end up across the street, so to speak, from this particular residence. And they watch some activity which turns out to be nothing more than normal everyday family-type activity. We don't have any cars pulling up in front of this residence, and people running up, and those other activities that are -- I'm sure the Court is familiar with -- that are normally short-term, short-stay traffic. We have absolutely no indication that there's any kind of drug activity going on.

So, seeing no activity, these two guys decide that they are going to go over ultimately and into the area of this residence. In doing so, they enter a place where I don't believe they've been invited. They've got their guns on. They've got their nice little Stockton Police Department vests or raid vests or jackets of some sort, as I remember Officer McCutcheon's testimony, and then off and up -- and then off to the side of the house this structure they go.

This area is what is commonly called, I believe, the curtilage. It is a protected area. Common law protects that area, among other things. And it's also incorporated in a fair amount of decisions by, most notable, I think by the United States Supreme Court. Especially in some discussions like -- I think what's called the Open Fields Doctrine. You know, you've got -- generally you see that in an area where you've got a farm house and you've got an area that's around that, and then you've got all these

south forties, and north forties, and whatever else. And those areas are not -- even if they are protected by having fences up and no trespassing signs on them, those don't seem to be granted the same protection. The court seems to look at those -- that area as the same as the house. It has the same Fourth Amendment protections. Even the California Supreme Court agrees that there's places that you don't go within -- that are considered within that area.

In a case by the name of People versus Camachos, C-A-M-A-C-H-O-S, at 23 Cal.4th, 824, cops ultimately go up alongside of a building and then ultimately into the backyard, and they are peaking through windows and stuff. And the Court says you can't do that. You take a little quick aside here for the moment just so that we can deal with a relatively simple little issue, and that's Mr. Escarsega's -- again, I hope I pronouncing that right -- parole status.

At this particular stage, it's irrelevant because the officers don't know who he is. They don't know who anybody is. Since they don't know who he is, they don't know what his parole status is. And absent knowing what his parole status is, they don't otherwise get into that house. And that's probably People versus Robles, R-O-B-L-E-S, 23 Cal.4th, 789, I believe was the authority for that.

And back to this curtilage area, there are some Supreme Court cases that I think the Court might want to

look at. And in reference to the issue of standing, as the Court was dealing with earlier, that's a pretty old concept. I don't think it really works anymore. The idea is whether or not this is a place that a reasonable person would expect a degree of privacy at which the people would agree that that's so. And I don't know of anybody that says a house isn't that.

And that's also discussed in U.S. versus Oliver, 466 U.S. -- and I apologize, I'm having a hard time reading my handwriting. I think it's 170, but my handwriting, it could be 770. But I believe it's 170.

And I think to go along with that, you have a case U.S. versus Dunn, 480 U.S., 294. And in that particular case, what the Defendant wanted to do was to have suppressed some contraband that was discovered in a garbage pile. Well, unfortunately for, I guess it was Mr. Dunn, the garbage pile was -- the garbage was in a can that was outside.

The Court noticed specifically it was outside of the curtilage. So the Court gives -- at least that's my interpretation -- the same amount of protection to the area surrounding the house or the residence as it does to entry into the residence itself. We have in this particular place, this particular series of events, no exigent circumstances. There's nobody running around bleeding, running into the house. There's nobody that's being chased down the road for supposedly having committed a felony or even a misdemeanor drunk driving and pulling

into -- up and running into the house, and that they are now depriving anybody of the ability to test their blood.

The most we get before entry is started into the house is somebody smells some marijuana, or what they think to be marijuana. At that point, they may have probable cause to get a warrant. But there is absolutely no activity going on that gets them to believe that something's being destroyed.

But the problem is, even if you wanted to argue that, we're already inside the curtilage. And I think the pictures of the house clearly show that there is -- that because if you look, there's this great big huge -- my definition -- fence across the front of the house that seems to say this is an area that you're not allowed in.

And my recollection of the cases that deal, in this state anyway, with that idea is, well, okay, but then you didn't do anything to prevent people from being there. So having an open front yard is an invitation to the porch. Well, clearly that doesn't exist. There is this nice little fence. So, I think these guys were in a place where they couldn't be legitimately.

THE COURT: Okay. Ms. Aguirre.

MR. HUDSON: I'll submit it on that. I don't see any point in arguing the other.

MS. AGUIRRE: Your Honor, looking at the totality of the circumstances of this case, the officers are originally called out to this particular location on reports of narcotics activity. They do sit on the house

EXhibit

(E)

Exhibit [E]

## Points and Authorities

"THE WARRANTLESS ENTRY WAS ILLEGAL"

THE COURT IN, MYERS VS. SUPERIOR COURT, 124 CAL. APP. 4th. 1247, 22 CAL. RPTR. 3d. 369, FOUND THAT A SEARCH CONDUCTED without A WARRANT is UNREASONABLE PER SE UNDER the fourth AMENDMENT unless it falls within one of the SPECIFICALLY ESTABLISHED AND WELL delineated Exceptions. PEOPLE VS. WOODS, (1999) 21 CAL. 4th. 668, 674, 88 CAL. RPTR. 2d. 88, 981 P.2d. 1019. "CONSENT is ONE of those Exceptions." HERE, Plaintiff NEVER GAVE His CONSENT to ENTER his home. MR. ESCARSEGA'S informed the officer's, I.E. [McCutcheon AND Huff] THAT the Address WAS NOT 835 W. FREMONT, but 837 W. FREMONT STREET. THERE WAS NO CONSENT, NOR WARRANT for Defendant's To ENTER Plaintiff's Home. SEE, EXHIBIT (D)

IN PEOPLE VS. SANDERS, (2003) 31 CAL. 4th. 318, 2d. CAL. RPTR. 3d. 630, 73 P. 3d. 496, THE SUPREME COURT concluded THAT "[A] Parolee's EXPECTATION of Privacy is deminished, but it is NOT ELIMINATED. SANDERS, SUPRA, 31 CAL. 4th. AT P. 332, 2 CAL. RPTR. 3d. 630, 73 P.3d. 496. THE COURT EXPLAINED THAT "WHETHER A SEARCH is REASONABLE MUST BE DETERMINED BASED UPON the CIRCUMSTANCES KNOWN to OFFICER'S WHEN the SEARCH is CONDUCTED."

Plaintiff ESCARSEGA Points OUT TO THE COURT, THAT DEFENDANT'S WERE SURVEILLENCING 835 W. FREMONT STREET, AND KNEW Plaintiff WAS NOT the PERSON UNDER SURVEILLENCE. YET, DEFENDANT'S ENTERED His HOME BASED ON A SMELL of MARAJUANA. DEFENDANT'S KNEW or SHOULD of KNOWN, that

THE SMELL OF MARIJUANA, IN AND OF ITSELF, IS NOT SUFFICIENT TO JUSTIFY DEFENDANT'S ENTRY INTO PLAINTIFF'S HOME. SEE PEOPLE VS. HUA, 158 CAL. APP. 4th. 1027, 70 CAL. RPTR. 3d. 599. THE HUA COURT FOUND, AN EXIGENT CIRCUMSTANCE IS NEEDED FOR A WARRANTLESS ENTRY INTO ONE'S HOME [REGARDLESS] OF THE STRENGTH OF THE PROBABLE CAUSE TO ARREST, OR THE EXISTENCE OF A STATUTE AUTHORIZING THE ARREST.... U.S.C.A. CONST. AMEND 4.

IN THIS CASE, DEFENDANT'S ENTRY INTO PLAINTIFFS ESCARSEGA'S DUPLEX WAS NOT JUSTIFIED UNDER THE EXIGENT CIRCUMSTANCES EXCEPTION TO THE WARRANTLESS REQUIREMENT; AT THE TIME OF ENTRY DEFENDANT'S BELIEVED PLAINTIFF WAS SMOKING MARIJUANA, OR POSSESSED MARIJUANA. DEFENDANT'S KNEW OR SHOULD OF KNOWN, SIMPLE POSSESSION OF LESS THAN 28.5 GRAMS WAS A MISDEMEANOR PUNISHABLE BY A FINE OF NO MORE THAN A $100.00, "AND NOT", SUFFICIENT TO JUSTIFY ENTRY INTO PLAINTIFF'S HOME, WITHOUT A WARRANT OR CONSENT. SEE, WELSH VS. WISCONSIN, (1984) 466 U.S. 740-753-754, 104 S.CT. 2091, 80 L.ED. 2d. 732.

IN WELSH, SUPRA, THE [UNITED STATES SUPREME COURT] RECOGNIZED, AS A BASIC PRINCIPLE OF FOURTH AMENDMENT LAW, THAT SEARCHES AND SEIZURES INSIDE A HOME WITHOUT A WARRANT ARE PRESUMPTIVELY UNREASONABLE. THE WELSH COURT, FURTHER RECOGNIZED THAT ENTRY INTO A HOME BASED UPON THE ODOR OF MARIJUANA, WAS ILLEGAL BECAUSE THE OFFENSE KNOWN TO THE OFFICERS AT THE TIME OF ENTRY, THE SIMPLE POSSESSION OF MARIJUANA [HEALTH & SAF. CODE, § 11357, SUBD. (b)], IS A NONJAILABLE OFFENSE AND, THEREFORE CANNOT JUSTIFY AN ENTRY TO PREVENT THE EMINENT DESTRUCTION OF EVIDENCE. SEE, EXHIBIT (C) [DEFENDANT'S ENTRY BASED ON MARIJUANA ODOR]....

In People vs. Ortiz, (1995) 32 Cal. App. 4th. 286, 291, 38 Cal. Rptr. 2d. 59, the Court found "an exigent circumstance is needed for a warrantless entry into ones home regardless of the strength of the probable cause to arrest or the existence of a statute authorizing the arrest." Here, Defendants clearly knew or should have known, Plaintiff Escarsega's home was protected under the IV and XIV Amendments to the United States Constitution, and they arbitrarily and capriciously entered his home illegally, Prior to finding out he was on Parole.

Plaintiff Escarsega points out to the Court, that State vs. Campbell, 581 F.2d. 22 (CA 2, 1978) found that a warrantless home arrest for armed robbery was allowed when exigent circumstances existed. However, a warrantless home arrest for murder without exigent circumstances was "dissallowed". See. Commonwealth vs. Williams, 483. PA. 293, 396. A. 2d. 1177, (1978). "The [exigent circumstances] exception is narrowly drawn to cover cases of real and not "contrived" emergencies. The exception is limited to the investigation of serious crimes, misdemeanors are excluded". People vs Strelow, 96 Mich. App. 182, 190-193, 292 N.W. 2d. 517, 521, 522, (1980)

Plaintiff Escarsega relies on the Rulings within "United States vs. United States District Court," 407 U.S. 297, 313 92. S. Ct. 2126, 2134, 32 L.Ed. 2d. 752 (1972), which provides protection against unnecessary intrusions into private dwellings, and the warrant requirements pursuant to

the Fourth Amendment on agents of the Government who seek to enter a home for purposes of a search or arrest. See, Johnson vs. United States, 333, U.S. 10, 13-14, 68 S.Ct. 367, 368-369, 92 L.Ed. 436 (1948). Here, the Defendant's conduct was a blatant violation of the basic principle of Fourth Amendment law. Defendant's search and arrest inside Plaintiff Escarsega's home without a warrant was presumptively unreasonable. See, Payton vs. New York, 445 U.S. at 586, 100 S.Ct. at 1380. [No] urgent circumstances to justify Defendant's forced entry into Escarsega's home was present in this case.

THERE WAS NO CAUSE TO SEARCH PLAINTIFF'S HOME

The District Courts have long reasoned that under Griffin vs. Wisconsin, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed. 2d. 709 (1987); and United States vs. Knights, 534 U.S. 112, that reasonable suspicion is required to justify a search and subsequent seizure. It is well established under the Fourth Amendment, to arrest a suspect on probable cause, [the facts and circumstances within the officer's knowledge [must be] sufficient to warrant a prudent person, or one of reasonable caution, in believing that the suspect has committed, is committing, or about to commit a crime at the time of their intrusion. See, Michigan vs. DeFillippo, 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed. 2d. 343 (1979). Here, Defendant's had no reason to believe Plaintiff Escarsega was involved in criminal activity, Escarcega was in the privacy of His own home. The Defendant's [did not] know of His Parole status until after their illegal entry.

Plaintiff ESCARSEGA APPLIES THE Findings of, People VS. Sanders, 31 CAL.4th. 318, (2003), SUPRA., THAT, [Police CANNOT Justify AN otherwise unlawful search of A Residence because, unbeknownst To the Police, A resident of A dwelling was on Parole or SUBJECT To A Search Condition]. Defendant's CANNOT Justify their Conduct, Nor CAN they rely on Exigent circumstances To relieve their Need for Probable Cause to search Plaintiff Escarsega's home, because the warrantless Intrusion was not based on A "Valid" Emergency Exception to the Rule. SEE, United States Vs. Lai, 944 F.2d. 1434, 1441, (9th cir. 1991).

Plaintiff ESCARSEGA Emphasizes, THE Supreme Court ruled that Probable Cause "[demands factual specificity]" AND, "[must be Judged according to AN objective Standard]." "Anything less would invite intrusions upon Constitutionally Guaranteed rights based on nothing more than inarticulate Hunches by Police officers. On these Grounds, Defendant's violated MR. ESCARSEGA'S fourth and fourteenth Amendments To the United States Constitution.

THE Forced Intrusion into Plaintiff's Body was Cruel and Unusual

AS A Result of Defendant's warrantless Entry and illegal search of Plaintiff Escarsega's Home, Forcing Plaintiff To INGEST A LAXATIVE; Submit to XRAYS; And Put Suppositories in his ANAL CAVITY based on the assumption he swallowed drugs, was A Blatant and Callous disregard of Plaintiff's Basic and Fundamental Rights Pursuant to the Eighth Amendment of the United States Constitution. SEE Exhibit (F).

Under the fourth Amendment Searches involving intrusions beyond body's Surface on mere chance that desired Evidence might be obtained are forbidden and in absence of "clear indication" that in fact such Evidence will be found, law officers are [Required] to suffer risk that such Evidence may disappear unless there is an Immediate Search. SEE, Smerber Vs United States, 384 U.S. 757, 86 S.Ct. 1826....

Plaintiff Escarsega did not Swallow Drugs in all forced Test, Results were negative. SEE Exhibit (F)

Plaintiffs rights were Arbitrarily intruded and he is Entitled to relief sought....



*(End of Statement)*

The medical staff ex-rayed Escarsega's abdomen, but were unable to see the suspected narcotics bindle he had swallowed. Medical staff then had Escarsega drink a liquid they said would make him defecate very quickly, passing the suspected narcotics bindle. We waited for approximately 1 hour for Escarsega to defecate. Escarsega said he was unable to defecate. Medical staff then gave Escarsega two suppositories to make Escarsega defecate to pass the suspected narcotics bindle he had ingested. We waited approximately 1 additional hour and

| Report Officer | Printed At | |
|---|---|---|
| 1066/MC CUTCHEON,FRANK FAIRFIELD | 02/05/2009 16:29 | Page 6 of 6 |